UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
EMILIA ROSE SELLICK,                    :
                                        :
                    Plaintiff,          :      09 Civ. 6616 (DLC)
                                        :
          -v-                           :
                                        :      OPINION & ORDER
AGENCY-CASTLE POINT, VETERANS           :
ADMINISTRATION MEDICAL CENTER, DR.      :
DAVID GITELSON, and ERIK K. SHINESKI,   :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For Pro Se Plaintiff:
Emilia Rose Sellick
43 Wright Boulevard
Hopewell Junction, NY 12533

For Defendants:
Amy Barcelo
United States Attorney's Office
86 Chambers Street, 3rd Floor
New York, NY 10007

DENISE COTE, District Judge:

     Plaintiff Emilia Rose Sellick ("plaintiff"), an employee of

the U.S. Department of Veterans Affairs (the "VA"), brings this

lawsuit for employment discrimination under Title VII and the

ADEA against Agency-Castle Point, the Veterans Administration

Medical Center, David Gitelson, and Eric K. Shineski[1]

(collectively, "defendants").  The plaintiff alleges that she

---

[1] The complaint misidentifies Shinseki as "Erik K. Shineski."

was not hired for a social worker position in July 2006 because of her religion, age, gender, or national origin.  The plaintiff also asserts that, in 2009, the VA retaliated against her by refusing to hire her for several other job openings.  On March 19, 2010, the defendants moved for summary judgment on all claims.  For the following reasons, that motion is granted in its entirety.

BACKGROUND

The following facts are undisputed or are presented in the light most favorable to plaintiff.[2]  The plaintiff is currently employed as an Imaging Program Assistant at the Castle Point Campus ("Castle Point") of the VA's Hudson Valley Healthcare System (the "Hudson Valley VA").  In her role as Imaging Program Assistant, the plaintiff is responsible for greeting patients and visitors, registering and scheduling patients for X-ray exams, relaying communications between doctors, and answering patients' questions.  The plaintiff has held this position, which is rated as GS-6 on the federal government pay scale, for the past ten years.

---

[2] The plaintiff does not provide any factual materials, affidavits, or declarations in opposition to this motion, nor does she enclose a Rule 56.1 statement.  Therefore, in deciding this motion, the Court considers the factual materials supplied by the defendants, the plaintiff's deposition testimony, documents annexed by the plaintiff to her complaint, and correspondence and other submissions made by the plaintiff throughout this litigation.

I.   Plaintiff's Relationship with Dr. Gitelson

The plaintiff became a VA employee in November 1991.  From 1991 to about 1999, the plaintiff held the position of Secretary of Social Work at Castle Point, which was then an independent VA hospital.  The plaintiff's duties in this position included typing social workers' handwritten reports, answering the telephone, and performing other administrative tasks.

Throughout the early 1990s, Dr. David Gitelson ("Gitelson") was the Chief of Social Work at Montrose Hospital ("Montrose"), a different VA hospital approximately twenty-five miles from Castle Point.  The plaintiff and Gitelson became acquainted sometime in the early-to-mid 1990s, but they did not work together directly at that time.  In or about 1996, however, Castle Point merged with Montrose to form the Hudson Valley VA. Upon consolidation, Gitelson assumed the title of Chief of Social Work for the Hudson Valley VA and also became the plaintiff's supervisor.[3]

Gitelson served as the plaintiff's supervisor from about 1996 until about 1999.  According to the plaintiff, her working relationship with Gitelson at first was "cordial."  After some time, however, the relationship became "uncomfortable."  At her deposition, the plaintiff testified that Dr. Gitelson began

---

[3] Gitelson, who remains employed by the VA, is currently Professional Leader for Social Work at the Hudson Valley VA.

treating the plaintiff less respectfully than he did other
employees.  Although Gitelson generally gave the plaintiff
positive ratings on her performance appraisals, Gitelson once
criticized the plaintiff in a performance review for failing to
change a printer cartridge promptly.

The plaintiff's working relationship with Gitelson during
the late 1990s was punctuated by several instances of
interpersonal tension.  In or about 1998, the plaintiff began
attending evening classes at Adelphi University ("Adelphi") with
the goal of obtaining a master's degree in social work ("MSW").
In or about 1999, the plaintiff entered a phase of her MSW
program that required her to occasionally miss work.  According
to the plaintiff, when she first asked Gitelson for permission
to use her accrued annual leave time ("AL time") to attend
classes at Adelphi each Tuesday morning, Gitelson firmly refused
to allow it.  Gitelson eventually acceded to the plaintiff's
request, however, after the plaintiff learned that Gitelson was
using his own AL time to teach classes at Adelphi every Friday
morning.[4]

Later, in or about 1999, the plaintiff took a class at
Adelphi entitled "Advanced Group Work" that was taught by

---

[4] In his declaration attached to the defendants' summary judgment
materials, Gitelson represents that he does not remember
refusing to let the plaintiff use her AL time to attend classes
at Adelphi.

Gitelson himself.  Gitelson gave the plaintiff a "D" on the first paper that she submitted for the class.[5]  Unhappy with this grade, the plaintiff scheduled a meeting with Gitelson to discuss the paper.  According to the plaintiff, during that meeting, Gitelson criticized plaintiff's lack of insight, used negative put-downs, and told her she would not make a good social worker.[6]  As her final grade in the class, Gitelson gave the plaintiff a "C-", the lowest grade she received for any class at Adelphi.  Based on this experience, the plaintiff became convinced that Gitelson was trying to cause her to fail the MSW program.

One other incident occurred during the late 1990s which the plaintiff considers pertinent to this lawsuit.  Every holiday season, the plaintiff wears a "Christmas bell" while at work; the bell jingles when the plaintiff moves or when it is otherwise disturbed.  On one occasion, in or about December 1998, Gitelson called the plaintiff into his office and abruptly instructed her to take off her bell.  According to the plaintiff, when she asked Gitelson why she should remove her

---

[5] In his declaration, Gitelson recalls that he gave plaintiff a "low grade" on one of her papers, but states that he does not remember what grade he gave specifically.

[6] The plaintiff also testified that she re-submitted the same paper in another course and received an "A" for the paper.

bell, he responded, "[b]ecause it annoys me."[7]

## II. The Plaintiff's Job Transfers

In 1999, the Hudson Valley VA was restructured, and the social work service to which the plaintiff had previously been assigned was eliminated. The plaintiff was re-assigned to work as a secretary on the "hospital care line." The general supervisor of the hospital care line was Dr. Malati Kollali ("Kollali"). The plaintiff testified that while working for Kollali, she was subjected to a hostile work environment, such as receiving antagonistic e-mails from her coworkers and unduly harsh criticism from her supervisors. The plaintiff also claims that, while she was working on the hospital care line, Gitelson "manipulated" Kollali and others "to make [plaintiff] look like [she] was an incompetent worker." After the plaintiff complained about her working conditions, she was reassigned to work in human resources for several months. Thereafter, the plaintiff was permanently reassigned to her current position in the imaging department.

---

[7] In his declaration, Gitelson states that he asked her to remove the bell because a social worker had complained to him that the noise of the plaintiff's bell was disrupting the worker's meeting with a patient.

III.   Application for a Social Worker Position

In May 2003, the plaintiff graduated from Adelphi with an MSW degree.  In January 2004, the plaintiff obtained part-time employment as a substance abuse counselor and social worker at St. Francis Hospital, although she also continued to work at Castle Point.

In or about June 2006, the plaintiff applied for a job opening as a social worker in the substance abuse program at the Montrose Campus of the Hudson Valley VA.[8]  At the time plaintiff applied, three social worker positions were available, each at GS-9 or higher on the government pay scale.  The selecting officials for the social worker positions were Gitelson and Betty Gilmore ("Gilmore"), then the Manager of Behavioral Health Rehabilitation Programs at the Hudson Valley VA.[9]

As part of the selection process, Gitelson and Gilmore

---

[8] At her deposition, the plaintiff also made reference to a social work position she applied for at the Hudson Valley VA in or about 1996 or 1997.  The plaintiff represented, however, that her claims in this lawsuit pertain only to the social work position that she applied for in 2006, along with the subsequent acts of retaliation.  Nevertheless, in her opposition to the defendants' motion, the plaintiff takes issue with defendants' characterization of various circumstances surrounding plaintiff's application for the 1996/1997 social worker position.  Because the plaintiff has voluntarily confined her claims to acts of alleged discrimination since 2006, however, the Court declines to consider this collateral factual dispute.

[9] In their declarations, Gitelson and Gilmore state that the latter was the final decisionmaker, although the two collaborated in determining whom to hire.  Gilmore has since retired from the VA.

conducted interviews with each applicant, including the plaintiff.[10]  Gitelson and Gilmore asked each candidate, including the plaintiff, the same set of questions.  Following each interview, Gitelson and Gilmore separately rated each candidate on a scale of 0 to 10 in each of six evaluative categories.  Both Gitelson and Gilmore awarded plaintiff only 1 point for each of the six categories, giving plaintiff a total score of 12 out of a possible 120 points.  In contrast, the three candidates who were ultimately hired received scores of 67, 86, and 94.[11]

Following these interviews, a select group of candidates, including the plaintiff, was invited to visit the in-patient program at which the three social workers would be based.[12]  While visiting, each candidate did a secondary interview with two supervisors from the substance abuse program: Dr. Warren Goldfarb ("Goldfarb"), who was the Team Leader for Residential

---

[10] At her deposition, the plaintiff testified that she had asked human resources to have Gitelson removed from the interview panel because "[s]he had a fear of Dr. Gitelson not being fair and discriminating [against her]."

[11] The score of "86" appears to have been incorrectly calculated, as the scores contained on the rating sheets annexed to Gilmore's declaration add up to 83, not 86.

[12] In their declarations, Gitelson and Gilmore avow that, in deciding to send the plaintiff for a second-round interview, they consciously aimed to give her application "as complete [a] consideration as possible."  This decision was motivated, in part, by their awareness that the plaintiff felt she had been slighted by Gitelson in the past.

Substance Abuse, and Dr. Alan Wachtel ("Wachtel"), the Acting

Team Leader for Outpatient Substance Abuse.  Gilmore supplied

Goldfarb and Wachtel with a list of questions to ask the

candidates and a set of rating scales identical to those used by

Gilmore and Gitelson in the prior interviews.  In her secondary

interview with Goldfarb and Wachtel, the plaintiff received a

total score of 13 out of 120, while the three successful

candidates received scores of 96, 100, and 104.[13]  The plaintiff

was then notified that she had not been selected.

## IV.  Procedural History

In August 2006, the plaintiff filed a complaint of

employment discrimination with the VA's Equal Employment Office

("EEO") for failure to hire based on age, sex, and national

origin (the "2006 EEO Charge").  Following extensive

administrative proceedings in which the plaintiff was

unsuccessful at pursuing her claims, the Equal Employment

Opportunity Commission ("EEOC") denied reconsideration on June

16, 2009, and advised the plaintiff of her right to bring a

civil action.

On July 17, 2009, the plaintiff timely filed a complaint

with this court alleging claims under Title VII of the Civil

---

[13] In her declaration, Gilmore states that Wachtel and Goldfarb
completed their ratings for each candidate without knowledge of
the prior ratings made by Gilmore and Gitelson.

Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA").  Following discovery, on March 19, 2010, the defendants moved for summary judgment on all claims and served plaintiff with a "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment."[14]  Plaintiff submitted a letter of opposition on April 9 (the "April 9 Opposition"), and on April 30, the defendants filed their reply.[15]

<u>DISCUSSION</u>

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the

---

[14] Summary judgment may not be entered against a <u>pro se</u> plaintiff unless she has received notice of her obligations to oppose the summary judgment motion.  <u>See</u> <u>Irby v. N.Y. City Transit Auth.</u>, 262 F.3d 412, 414 (2d Cir. 2001); <u>Vital v. Interfaith Med. Ctr.</u>, 168 F.3d 615, 620-21 (2d Cir. 1999).  To that end, the defendants have certified that they served plaintiff with a copy of the Local Rule 56.2 Notice with their summary judgment materials.  Additionally, the Court enclosed copies of Rule 56, Local Rule 56.1, and the Local Rule 56.2 Notice with its March 26, 2010 Order setting a briefing schedule for the defendants' summary judgment motion.  Such notice was clearly sufficient to advise plaintiff of her burden to oppose the defendants' summary judgment motion.

[15] As directed by an Order of May 26, 2010, the defendants filed a supplemental declaration on May 27 containing a complete transcript of the plaintiff's deposition.

court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see also Holcomb, 521 F.3d at 137.  Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Holcomb, 521 F.3d at 137.  The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

Finally, in considering the defendants' summary judgment motion, the court liberally construes all submissions by the pro se plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).  This policy of liberal construction is aimed at "protect[ing] pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." Id. at 475 (citation omitted).  The application of this forgiving standard for pro se litigants, however, "does not

12

relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." <u>Jorgensen v. Epic/Sony Records</u>, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

I.   Plaintiff's Discrimination Claims

Plaintiff brings claims of employment discrimination under both Title VII and the ADEA.  Title VII provides that "[a]ll personnel actions affecting [federal] employees or applicants for [federal] employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  The ADEA provides that "[a]ll personnel actions affecting [federal] employees or applicants for [federal] employment who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  Under the ADEA, the plaintiff must demonstrate that age discrimination was the "but-for cause" of the adverse employment action, while under Title VII, the plaintiff may prevail even where discrimination was only a "motivating factor behind the adverse action."  <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 498 n.2 (2d Cir. 2009) (citing <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. __, __, 129 S. Ct. 2343, 2350-51 (2009)).

Claims of employment discrimination brought under Title VII or the ADEA are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  "To establish a prima facie case of age discrimination under the ADEA or [any form of] discrimination under Title VII, a plaintiff must demonstrate the following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  Leibowitz, 584 F.3d at 498.  A plaintiff's burden in presenting evidence to support a prima facie case is "de minimis."  Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (citation omitted).

If the plaintiff satisfies this initial burden, a presumption of discrimination arises and "the burden shifts to the defendant[s] to articulate some legitimate, nondiscriminatory reason for the adverse act."  Leibowitz, 584 F.3d at 498-99 (citation omitted).  If the defendants can offer such a reason, the presumption of discrimination dissolves, and "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for discrimination."  Id. at 499 (citation omitted).  Although the burden of producing evidence may shift between the parties

under this framework, "the ultimate burden of persuading the
trier of fact that the defendant[s] intentionally discriminated
against the plaintiff remains at all times with the plaintiff."
Id. (citation omitted).

A.   The Plaintiff's Prima Facie Case

     The plaintiff bears the initial burden of "making out a
prima facie case of discrimination."  Beyer v. County of Nassau,
524 F.3d 160, 163 (2d Cir. 2008).  The defendants, without
conceding any other element of plaintiff's prima facie case,
focus their arguments on plaintiff's purported failure to
satisfy the fourth prong, namely, to demonstrate that "the
adverse action occurred under circumstances giving rise to an
inference of discrimination."  Leibowitz, 584 F.3d at 498.

     A plaintiff may satisfy the fourth prong through any of at
least three different kinds of evidence.  First, the plaintiff
may carry her burden "by showing that the employer subjected
[her] to disparate treatment, that is, treated [her] less
favorably than a similarly situated employee outside [her]
protected group."  Graham v. Long Island R.R., 230 F.3d 34, 39
(2d Cir. 2000).  A plaintiff relying on this type of evidence
"must show she was similarly situated in all material respects
to the individuals with whom she seeks to compare herself."  Id.
at 39 (citation omitted).  Second, a plaintiff may carry her

burden by demonstrating that the defendants have engaged in a "pattern-or-practice" of intentional discrimination. Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001). To succeed on this theory, a plaintiff "must establish that intentional discrimination was the defendant[s'] 'standard operating procedure.'" Id. (citation omitted).

Finally, the plaintiff may satisfy her burden of proving the fourth prong by adducing facts which "evince[] a discriminatory state of mind" on the part of the employer. Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007). "[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action]." Leibowitz, 584 F.3d at 502 (citation omitted). "[B]ecause 'smoking gun' evidence of discriminatory intent is rare," a court must carefully review the record to search for any kind of evidence that would support an inference of intentional discrimination. Forsyth v. Fed'n Emp't & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005); see also Holcomb, 521 F.3d at 141 ("[E]mployers are rarely so cooperative as to include a notation in the personnel

16

file that the [adverse action was taken] for a reason expressly forbidden by law." (citation omitted)).

The plaintiff claims that she was intentionally discriminated against on four separate grounds: religion, age, gender, and national origin.  The plaintiff has failed to make out a prima facie case for any of these claims.

1.  Religion

First, the plaintiff claims discrimination based on her religion.  The plaintiff identifies as an observant Catholic.  She frequently wears a cross, and dresses in Christmas-themed clothing during the holiday season.  At her deposition, the plaintiff testified regarding her general impression that Gitelson hires "people that are mostly Jewish, and [] if they are not Jewish, they are old-time friends."  The plaintiff further testified that each of the three successful candidates for the social worker positions were Jewish.[16]  The plaintiff reached this conclusion by asking her coworkers whether the newly hired employees were Jewish and then confirmed this fact

---

[16] One of the three did not remain in the social worker position for more than a short time.  He was then replaced by a man who is not Jewish, but whom the plaintiff believes to be a long-time acquaintance of Gitelson.

for two of the three by contriving a means of asking them about their religion directly.[17]

The plaintiff has not made out a _prima facie_ case of discrimination based on her religion.  Although she has testified that the three successful candidates were Jewish, she has not produced any evidence tending to show that she was similarly situated to those three candidates with respect to her qualifications for the position.  Likewise, although she asserts that the "Christmas bell" incident in 1998 is suggestive of discrimination, the circumstances surrounding this incident do not warrant a reasonable inference that Gitelson possessed a "discriminatory state of mind" eight years later with respect to plaintiff's religion.[18]  Finally, although the plaintiff asserts that Gitelson was aware that she is Christian, that fact is not in itself probative of any discrimination.

---

[17] Specifically, the plaintiff sent each of the three employees an e-mail asking them, "At what age did you or a family member celebrate Bar Mitzvah??"  Two of the three responded: "13 years old."  On this basis, the plaintiff concluded that those two were Jewish.

[18] The undisputed record reflects that Gitelson asked the plaintiff to remove her Christmas bell on that particular occasion because he or another coworker found its noise to be annoying or disruptive.  Indeed, the plaintiff conceded at her deposition that "[one] could hear [the bell] dangling" and that "[s]ome [bells] were louder than others."  Moreover, the plaintiff has not shown that Gitelson ever objected to plaintiff wearing her bell or other Christmas-themed apparel on any other occasion.

2.   Age

Second, the plaintiff argues that she was discriminated against based on her age.  At the time of the alleged discrimination, the plaintiff was fifty-six years old.  At her deposition, the plaintiff testified that she alluded to her age during her interview, and she further testified that Gitelson knew her age because he had access to the plaintiff's personnel records.

The plaintiff has not offered any evidence to support a prima facie case of age discrimination.  When asked at her deposition why she believed she had been discriminated against based on age, the plaintiff stated that the only woman hired for the 2006 social worker positions was younger than she was.  The plaintiff also testified generally that, to the best of her knowledge, Gitelson has only hired women who are younger than the plaintiff.[19]  Aside from that bare assertion, however, the plaintiff has not adduced any evidence of a pattern or practice of age discrimination, nor has she shown that she was similarly situated to any younger applicant who was ultimately selected for a social work position.  In the absence of any such evidence, an inference of discrimination cannot be drawn.

---

[19] At her deposition, the plaintiff did not indicate whether her allegation in this respect also extended to men as well, and the defendants did not seek clarification.

### 3.  Gender

Third, the plaintiff claims discrimination based on gender.
The plaintiff observes that only one of the three social worker
positions went to a female.  The plaintiff also alleges,
generally, that men are chosen for social worker positions at
the Hudson Valley VA more frequently than women.  Finally, at
her deposition, the plaintiff asserted that, because she felt
that the interview with Gitelson and Gilmore had gone very well,
the reason that she was not chosen must have been gender
discrimination.

The plaintiff has failed to make out a <u>prima facie</u> claim
for gender discrimination.  Although the plaintiff has hinted at
the beginnings of a "pattern or practice" claim through her
speculation that men are hired more often than women at the
Hudson Valley VA, she has adduced no evidence whatsoever to
support that assertion.  In short, other than offering her own
speculation and conjecture, the plaintiff has not come forward
with any evidence of gender discrimination.

### 4.  National Origin

Finally, the plaintiff claims discrimination based on her
national origin.  The plaintiff identifies her national origin
as "full German."  The plaintiff was born in Poland and lived
there for the first eight-and-a-half years of her life.  She

then lived with her family in Germany for two years before
emigrating to the United States.  Because of this upbringing,
the plaintiff still speaks German and a little Polish.  The
plaintiff states that she had trouble learning English upon
arriving in the United States and that she continues to speak
English with an accent.[20]  On various occasions, including at the
2006 interview, the plaintiff discussed with Gitelson her accent
as well as the fact that she was born in Poland.  In addition,
the plaintiff testified that her personnel file states that she
was born in Poland and that she speaks German.

     The plaintiff has failed to make out a <u>prima facie</u> claim of
national-origin discrimination.  The plaintiff's only basis for
alleging discrimination is her speculation that "German is not
the nationality that [Gitelson] prefers" and her belief that
Gitelson has not hired anyone of full-blooded German descent
since the plaintiff first began applying for social work
positions.  Nevertheless, the plaintiff offers no proof of any
pattern or practice of intentionally discriminating against
German people, nor can the plaintiff identify any evidence

---

[20] In her opposition to the defendants' motion, as well as in an
unauthorized surreply submitted on or about May 7, 2010 (the
"May 7 Surreply"), the plaintiff argues that the defendants have
mischaracterized her accent.  Because the plaintiff has not
shown that her accent is relevant to her claims of
discrimination, however, the Court need not address this
dispute.

concerning Gitelson's beliefs about German people in general or about the plaintiff's national origin in particular.

B.   Defendants' Non-Discriminatory Reasons

Assuming arguendo that plaintiff had succeeded in making out a prima facie case as to any of her four claims, the burden would then shift to the defendants to produce evidence that they possessed a legitimate, nondiscriminatory reason for not hiring the plaintiff.  The defendants' burden is "one of production, not persuasion."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  At this stage, the court is not to pass judgment on the soundness or credibility of the reasons offered by defendants, so long as the reasons given are "clear and specific" and, therefore, sufficient to raise a genuine issue of material fact as to whether defendants discriminated against the plaintiff.  Mandell v. County of Suffolk, 316 F.3d 368, 381 (2d Cir. 2003) (citation omitted).

The defendants have produced evidence of a legitimate, nondiscriminatory reason for declining to hire plaintiff for the 2006 social worker positions.  Specifically, the defendants have produced evidence that the plaintiff was not as qualified as the three other candidates who were ultimately selected.  As described above, the plaintiff received a final combined score of 25 following her two rounds of interviews, while the three

successful candidates received final combined scores of 167,
182, and 198 respectively.  Gitelson's interview scores
reflected his judgment that the plaintiff "was not a clinically
competent social worker," while Gilmore concluded that the
plaintiff "demonstrated a lack of professionalism and a lack of
knowledge, experience, and understanding of social work
principles."  Both Gitelson and Gilmore stated that the
plaintiff's answers to their questions struck them as the type
of answers they would expect from someone who did not have any
formal training as a social worker.  The plaintiff's second-
round scores from Wachtel and Goldfarb corroborate defendants'
proffered reason.  Thus, the defendants' evidence more than
satisfies their burden in the second stage of the <u>McDonnell
Douglas</u> analysis.

C.   Plaintiff's Ultimate Burden

     Assuming once again that plaintiff had made out a <u>prima
facie</u> case, and given that the defendants have produced evidence
of a legitimate, nondiscriminatory reason for not hiring the
plaintiff, the <u>McDonnell Douglas</u> presumptions then "disappear
from the case."  <u>James</u>, 233 F.3d at 156.  The final burden falls
on plaintiff to demonstrate that the reasons proffered by
defendants were pretextual, "either directly by persuading the
court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); see also Holcomb, 521 F.3d at 141. Ultimately, what is required of the plaintiff at the final stage is "sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence" that unlawful discrimination caused the adverse employment action. Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010).

Just as the plaintiff has failed to make out a prima facie case of discrimination with respect to religion, age, gender, or national origin, the plaintiff has also failed to show that the defendants' proffered reason for not hiring her is pretextual. To be sure, the plaintiff does dispute the defendants' rationale, asserting in the April 9 Opposition that the defendants' submissions "[are] not true fact." Moreover, the plaintiff denies defendants' conclusion that she was not as qualified as the successful candidates. Nevertheless, a consideration of plaintiff's arguments shows that they are without merit.

In her April 9 Opposition, the plaintiff impugns the integrity of Gitelson's and Gilmore's hiring process and offers opinion evidence as to her own strong qualifications for the position. First, with respect to the hiring process, the

plaintiff argues that the scores that she received from Gitelson and Gilmore were not reflective of her true interview performance.  The plaintiff points to the fact that both Gitelson and Gilmore gave the plaintiff a score of 1 out of 10 in every category and concludes that this uncanny consistency makes it likely that the interview ratings were the product of collusion or concocted post hoc.  Indeed, the plaintiff asserts that Gitelson pressured or "manipulated" Gilmore into giving the plaintiff the same scores that he did.[21]

Plaintiff's speculation about the integrity of the hiring process is not sufficient to raise a triable issue of material fact.  The defendants have offered statements from both Gilmore and Gitelson declaring, under penalty of perjury, that each one completed scoring for the plaintiff's interview independently, and that to the extent their scores coincided, it reflects their common view of the skills required of a good social worker.  The plaintiff, meanwhile, has offered no evidence that would tend to cast Gilmore's and Gitelson's account into doubt or to show that the selection process was otherwise infected by discrimination.  Nor does the plaintiff attempt to rebut the evidence of the extremely low scores that she received from Wachtel and Goldfarb

---

[21] At her deposition, the plaintiff made clear that she did not believe Gilmore intended to discriminate against the plaintiff, but rather, that Gilmore was merely following Gitelson's instructions in order to stay in his good graces.

during her second-round interview.

The limited evidence offered by the plaintiff in support of her own qualifications for the social worker positions similarly fails to establish a reasonable basis for inferring discrimination.  At her deposition, the plaintiff testified that she has "good social work skills"; that she has received feedback from professors and supervisors that she is a "good social worker"; and that "[she] felt that [she] did a good job at the interview."[22]  This testimony does not raise a triable issue of fact for several reasons.

First, insofar as her evidence consists of statements about what other people have said to the plaintiff about the quality of her work, about the social worker hiring process, or about Gitelson, such evidence is inadmissible and cannot be considered on summary judgment.[23]  See Spiegel v. Schulmann, 604 F.3d 72, 81

---

[22] Likewise, in materials attached to her complaint, the plaintiff asserts, inter alia, that she "did well at an interview at another hospital"; that her "skills are excellent enough to be working as a mental health social worker for (4) years at another hospital"; and that her past and present supervisors at the Hudson Valley VA have supported her attempts to gain employment as a social worker.

[23] During her deposition, the plaintiff stated that she has had several conversations with coworkers concerning their or various third parties' negative experiences working with Gitelson, their beliefs that Gitelson engages in discrimination, or their suspicion that Gitelson makes hiring decisions based on whether applicants "fit[] his profile."  The plaintiff's scattered recollections of what other people may have told her in the past are not admissible, however, because they constitute hearsay

(2d Cir. 2010) (noting that the district court "may rely only on admissible evidence" on summary judgment (citation omitted)). Second, much of the plaintiff's testimony is wholly conclusory insofar as it consists of nothing more than her subjective belief that she is well-qualified and that because she was not hired, she must have been the victim of discrimination. "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory." Katel Ltd. Liab. Co. v. AT&T Corp., 607 F.3d 60, 67 (2d Cir. 2010) (citation omitted); see also Hicks, 593 F.3d at 166.

Although it is clear that the plaintiff firmly believes that the defendants were mistaken in refusing to hire her for a social worker position, it is not this Court's role to pass judgment on whether the VA has made wise employment decisions. "[I]t is not the role of federal courts to review the correctness of employment decisions or the processes by which those decisions are made," and thus, "[a] court must respect an employer's unfettered discretion to choose among qualified candidates." Sassaman, 566 F.3d at 314 (citation omitted).

---

being offered by the plaintiff in support of the proposition that Gitelson discriminated against the plaintiff.  See Fed. R. Evid. 801-02.  Although the plaintiff was advised at least twice regarding her burden to come forward with any evidence, including witness statements, that would support her discrimination claims, she failed to do so.

Moreover, although the plaintiff's testimony does support an inference that various supervisors and co-workers have not always behaved in a professional manner towards her, "personality conflicts at work that generate antipathy" and "snubbing by supervisors and co-workers" are, without any evidence of discrimination, simply not actionable under federal law.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation omitted); see also id. ("Title VII . . . does not set forth a general civility code for the American workplace." (citation omitted)).  Indeed, the purpose of Title VII and the ADEA is not to protect employees from all forms of adverse treatment in the workplace, but to ensure only "that the workplace be an environment free of discrimination." Ricci v. DeStefano, 557 U.S. __, __, 129 S. Ct. 2658, 2674 (2009). Accordingly, the plaintiff's discrimination claims must be dismissed.

## II.  Plaintiff's Retaliation Claims

In addition to the claims of discrimination addressed above, the plaintiff also asserts that the VA retaliated against her by refusing to hire her for three other positions to which she applied in 2009.  These three vacancies were not for social work positions, but rather for other positions at the VA,

including two program assistant positions and one supply
technician position.[24]

A plaintiff may sue for unlawful retaliation under both
Title VII and the ADEA.[25]  Title VII "makes it unlawful for an
employer to discriminate against an employee 'because he [or
she] has opposed any practice [made unlawful by Title VII], or
because he [or she] has made a charge . . . in an investigation,
proceeding, or hearing'" held under Title VII.  Kaytor v. Elec.
Boat Corp., __ F.3d __, 2010 WL 2593500, at *15 (2d Cir. June
29, 2010) (quoting 42 U.S.C. § 2000e-3(a)).  The ADEA likewise
"prohibits an employer from discriminating against an individual
employee because of the individual's opposing any practice made
unlawful under the statute."  Kassner v. 2nd Ave. Delicatessen,
Inc., 496 F.3d 229, 241 (2d Cir. 2007).  The purpose of these
anti-retaliation provisions is to "prohibit[] employer actions

---

[24] Because the plaintiff's allegations of retaliation are
"reasonably related" to the plaintiff's 2006 EEO Charge, the
plaintiff was not required to exhaust her administrative
remedies with respect to these three retaliation claims.  See
Mathirampuzha v. Potter, 548 F.3d 70, 75 (2d Cir. 2008).

[25] Although neither the text of Title VII nor that of the ADEA
explicitly provide that federal employees may bring suit for
retaliation, the Supreme Court has held that retaliation is
actionable under the ADEA's federal-sector provision, 29 U.S.C.
§ 633a.  See Gomez-Perez v. Potter, 553 U.S. 474, __, 128 S. Ct.
1931, 1936 (2008).  The Court assumes without deciding that
retaliation is also actionable under Title VII.  Cf.
Mathirampuzha, 548 F.3d at 74 n.3 (noting that the Court of
Appeals has "previously assumed without analysis that Congress
extended Title VII's prohibition on retaliation to the federal
sector").

that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." White, 548 U.S. at 68 (citation omitted); see also Hicks, 593 F.3d at 164.

To succeed on her claims of retaliation, "'[the] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Fincher v. Depositary Trust & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010) (quoting White, 548 U.S. at 68); see also Hicks, 593 F.3d at 165. Although "there are no bright-line rules with respect to what constitutes an adverse employment action for purposes of a retaliation claim," Fincher, 604 F.3d at 721 (citation omitted), a failure to hire or promote can support a claim of retaliation. See, e.g., Terry v. Ashcroft, 336 F.3d 126, 141-42 (2d Cir. 2003).

Retaliation claims under Title VII and the ADEA are analyzed under the same burden-shifting framework employed for considering claims of discrimination. See Kaytor, __ F.3d at __, 2010 WL 2593500, at *15; Fincher, 604 F.3d at 720; Gorzynski, 596 F.3d at 110. Thus, the Court considers, first, whether the plaintiff has established a prima facie case of retaliation; second, whether the defendants can articulate a

legitimate, nondiscriminatory reason for declining to hire the
plaintiff; and third, whether the plaintiff has produced
evidence that the defendants' rationale is pretextual and/or
that a reasonable jury could find that the failure to hire was
motivated by retaliation.   <u>Fincher</u>, 604 F.3d at 720.

A.   <u>Prima Facie</u> Case

To establish a <u>prima facie</u> retaliation claim, the plaintiff
must

> adduce evidence sufficient to permit a rational
> trier of fact to find (1) that she engaged in
> protected activity under the anti-discrimination
> statutes, (2) that the employer was aware of this
> activity, (3) that the employer took adverse action
> against the plaintiff, and (4) that a causal
> connection exists between the protected activity and
> the adverse action, i.e., that a retaliatory motive
> played a part in the adverse employment action.

<u>Id.</u> (citation omitted); <u>see also</u> <u>Gorzynski</u>, 596 F.3d at 110.
"The plaintiff's burden in this regard is <u>de minimis</u>, and the
court's role in evaluating a summary judgment request is to
determine only whether proffered admissible evidence would be
sufficient to permit a rational finder of fact to infer a
retaliatory motive."   <u>Hicks</u>, 593 F.3d at 164 (citation omitted);
<u>see also</u> <u>Kaytor</u>, __ F.3d at __, 2010 WL 2593500, at *15
(requiring, at the <u>prima facie</u> stage, only a "minimal amount of
evidence to support the elements of the claim").

The plaintiff alleges three instances of retaliation, each

occurring in February or March 2009.[26]  Each is described below.

  1.   The Two Program Assistant Positions

  In February or March 2009, the plaintiff applied for two Program Assistant positions at the Hudson Valley VA, each designated as GS-7 on the federal pay scale.  Dawn Schaal, Business Manager for the Ambulatory Care Line at the Hudson Valley VA, was the selecting official for one of these positions (the "Schaal Position").  Kollali, who by then had become Administrative Medicine Program Manager for the Hudson Valley VA, was the selecting official for the other position (the "Kollali Position").[27]

  In February or March 2009, the plaintiff applied for the Schaal Position.  The plaintiff was one of nine individuals who

---

[26] In the May 7 Surreply, the plaintiff also asserts that she was retaliated against in March 2010 by not being hired for a GS-7 medical administrative assistant position.  Because the defendants have not been able to pursue discovery with respect to this most recent dispute, the Court declines to consider this allegation as part of the pending lawsuit.  Cf. Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006) (observing that a plaintiff may not, in opposing summary judgment, assert new claims in an effort to defeat summary judgment).

[27] The defendants have provided the vacancy announcements for each of these positions with their summary judgment materials.  One of these positions was designated as "Announcement Number 09-12" while the other was designated "Announcement Number 09-15."  The defendants' submissions, however, are inconsistent with respect to which of these announcements was for the Schaal Position and which was for the Kollali Position.  Nevertheless, the Court need not resolve this inconsistency, as it does not affect whether the defendants are entitled to summary judgment.

submitted applications.  To evaluate the nine candidates, Schaal
formed an interview panel comprising three individuals who had
previously held the position.  The panel members asked each
candidate the same ten questions and independently gave each
candidate a score of 1 to 5 for each question; these scores were
then tallied and averaged together.  The plaintiff received a
final score of 32 out of 50, while the candidate who was
ultimately hired for the Schaal Position received a score of 48.
The plaintiff asserts that, notwithstanding her lower score, the
true reason that she was not hired was that Schaal was
retaliating against her for having filed the 2006 EEO Charge.

In February or March 2009, the plaintiff also applied for
the Kollali Position, for which she was one of about ten
applicants.  No interviews were conducted for this position.
Instead, Kollali made the selection based on the candidates'
prior work experience, the candidates' written narratives
responding to questions in the employment application, and,
where, applicable, Kollali's personal knowledge of each
candidate.  The plaintiff, who rated in the bottom half of all
the candidates, was not selected for the Kollali Position.  The
plaintiff asserts, however, that she did not get the job because
Kollali was discriminating and/or retaliating against her for
having filed the 2006 EEOC Charge.

2.   The Supply Technician Position

Finally, in February or March 2009, the plaintiff applied for a GS-7 Supply Technician position.  Efrain Baez ("Baez"), the Logistics Program Manager at the Hudson Valley VA, was the selecting official for this position (the "Baez Position").[28] Six individuals applied for the Baez Position, including the plaintiff.  Baez assigned a panel of three people to interview the applicants, and the panel members asked each candidate the same set of questions.  Baez's hiring decision was guided by a 100-point scoring system.  The interview was worth 50 points; the candidate's written self-assessment of his or her "knowledge, skills, abilities, and other characteristics" was worth 25 points; the candidate's supervisor's recommendation was worth 10 points; and the candidate's annual performance review was worth 15 points.  The plaintiff received a final score of 53.2 points and was not selected, while the candidate who was ultimately hired received a final score of 72.3 points.  The plaintiff claims that the true reason that Baez did not hire her was that he had learned about the 2006 EEO Charge and was retaliating against her.

---

[28] This position was designated "Announcement Number 09-16."

3.   Analysis

Plaintiff has not made out a <u>prima facie</u> case of retaliation for any of the three positions described above.  It is undisputed that the plaintiff "engaged in protected activity" by filing the 2006 EEO Charge and that the plaintiff suffered "adverse action" insofar as she was not hired for any of the three positions.  Moreover, the second prong -- knowledge by the defendants of the protected activity -- is also satisfied.[29]  The plaintiff has failed, however, to produce any evidence of a "causal connection . . . between the protected activity and the adverse action."  <u>Fincher</u>, 604 F.3d at 720 (citation omitted).

A plaintiff may satisfy the causation requirement in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or

---

[29] The defendants dispute this factor, asserting that the selecting officials had no knowledge of the plaintiff's prior EEO activity.  The second prong, however, requires only a showing of "general corporate knowledge that the plaintiff has engaged in a protected activity."  <u>Patane v. Clark</u>, 508 F.3d 106, 115 (2d Cir. 2007) (per curiam) (citation omitted).  Here, it is undisputed that the Hudson Valley VA knew of the plaintiff's EEO activity.  Defendants correctly observe, however, that "[t]he lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment."  <u>Gordon v. N.Y. City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000) (emphasis omitted).

(2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Hicks, 593 F.3d at 170 (citation omitted).  The crux of plaintiff's theory of causation is that the three selecting officials -- Schaal, Kollali, and Baez -- were told about the plaintiff's past EEO activity by Sue Antonio ("Antonio"), a human resources specialist at the Hudson Valley VA who has known about the 2006 EEO Charge since early 2007.  The plaintiff testified at her deposition that Antonio has widely shared information about the plaintiff's EEO activity with not only the aforementioned hiring officials, but also with myriad other Hudson Valley VA employees, including Antonio's "fiscal friends."  The plaintiff further testified that she regularly sees Antonio with colleagues in the cafeteria behaving in a manner that suggests they are talking about the plaintiff.[30]

The plaintiff's proffered evidence concerning Antonio does not suffice to raise a causal inference linking the filing of the 2006 EEO Charge and the alleged acts of retaliation in 2009. The plaintiff's allegation that Antonio told the selecting officials about the plaintiff's 2006 EEO Charge appears to be grounded entirely in the plaintiff's own speculation.

---

[30] In the April 9 Opposition, the plaintiff also asserts that, at least once, she personally overheard Antonio mention the plaintiff's EEO activity to another coworker.  The plaintiff previously testified at her deposition, however, that she had never overheard such a conversation.

Meanwhile, each of the three selectors -- Schaal, Kollali, and
Baez -- have offered declarations stating under penalty of
perjury that, at the time they were making the hiring decisions,
each was unaware of the plaintiff's EEO activity; none had
spoken with Antonio concerning the plaintiff's EEO activity; and
each made his or her hiring decision based solely on objective,
nondiscriminatory criteria.  Although the plaintiff asserts in
her April 9 Opposition that she doubts the truth of those
declarations, her own subjective belief that the declarations
lack credibility is not sufficient to defeat summary judgment.[31]

## B.  Defendants' Non-Discriminatory Reasons

Assuming _arguendo_ that the plaintiff had established a
_prima facie_ case, "then a presumption of retaliation arises and
the employer must articulate a legitimate, non-retaliatory
reason for the action that the plaintiff alleges was
retaliatory."  _Fincher_, 604 F.3d at 720; _see also_ _Hicks_, 593

---

[31] Nor can the plaintiff benefit from a presumption of causation
based on temporal proximity.  "A plaintiff can indirectly
establish a causal connection to support a discrimination or
retaliation claim by showing that the protected activity was
closely followed in time by the adverse employment action."
_Gorzynski_, 596 F.3d at 110 (citation omitted); _see also_ _Kaytor_,
__ F.3d __, 2010 WL 2593500, at *15.  Here, however, the two-
and-a-half-year gap between the EEO activity and the alleged
retaliation renders the "temporal relationship [] too attenuated
to establish causation."  _Gorzynski_, 596 F.3d at 110; _see also_
_Clark County Sch. Dist. v. Breeden_, 532 U.S. 268, 274 (2001)
(holding that a twenty-month gap between protected activity and
adverse action was too attenuated to support any causal
inference).

F.3d at 164.  The defendants have met this burden.  Each of the
three selectors -- Schaal, Kollali, and Baez -- have provided
declarations stating that the plaintiff was not as qualified as
the candidates who were ultimately hired.  For the Schaal
Position, the plaintiff received a score of 32, well below the
successful candidate's score of 48; for the Kollali Position,
the plaintiff was "not in the top half of the candidates for the
position"; and for the Baez Position, the plaintiff received a
score of 53.2, while the successful candidate received a score
of 72.3.  This testimony satisfies the defendants' burden of
producing evidence of a legitimate, nondiscriminatory reason for
not hiring the plaintiff.

C.   Plaintiff's Ultimate Burden

     Assuming the plaintiff had made out a prima facie case of
retaliation, and given that the defendants have succeeded on the
second stage of the burden-shifting analysis, "the presumption
of retaliation dissipates and the plaintiff must show that
retaliation was a substantial reason for the complained-of
action."  Fincher, 604 F.3d at 720.  For substantially the same
reasons set forth in the analysis of the plaintiff's
unsuccessful discrimination claims, the plaintiff has also
failed to meet her burden of proving that the defendants'
proffered reasons are pretextual.

While the plaintiff has expressed doubts about the truthfulness of the declarations submitted by Schaal, Kollali, and Baez, the plaintiff nevertheless provides no evidence that would enable a reasonable factfinder to conclude that it was more likely than not that the plaintiff was a victim of unlawful retaliation.  The plaintiff has not shown that she was more qualified than the other candidates who were ultimately selected; she has not shown that the VA has a pattern or practice of retaliating against employees who file EEO complaints; and she has not produced evidence of retaliatory animus on the part of any of the selecting officials.  As such, the plaintiff's claims of retaliation do not require trial and must be dismissed.

### CONCLUSION

The defendants' March 19, 2010 motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED:

Dated:     New York, New York
           July 16, 2010

_____
                DENISE COTE
        United States District Judge

39

COPIES SENT TO:


Emilia Rose Sellick
43 Wright Boulevard
Hopewell Junction, NY 12533

Amy Barcelo
Assistant United States Attorney